UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANTONIO MARQUES SMITH,

                    Plaintiff,

    v.                                          Case No. 17-cv-668-pp

KERRY TURNER, *et al.*,

                    Defendants.

**ORDER GRANTING IN PART DEFENDANTS' MOTION TO RESTRICT DOCUMENTS (DKT. NO. 18), GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 19) AND DISMISSING CASE**

        The plaintiff, representing himself, filed this lawsuit under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. Dkt. No. 1. The court issued a screening order, allowing the plaintiff to proceed on the following claims: (1) a Fourteenth Amendment claim that defendants Dominque Smith, Maurice Slocum, Ocell Carr and Michael Zetting knowingly used force against him, and that the force was objectively unreasonable; (2) a claim that defendants Smith and Slocum violated the plaintiff's Fourteenth Amendment rights when Smith allegedly grabbed his testicles and Slocum allegedly touched his penis; and (3) a claim against defendant Turner for failing to intervene while the other defendants were violating the plaintiff's constitutional rights. Dkt. No. 8. The defendants filed a motion for summary judgment, dkt. no. 19, and a motion to restrict information related to the plaintiffs' medical records to only case participants and the court, dkt. no. 18.  The court will grant the defendants'

1

motion for summary judgment and grant in part the motion to restrict the plaintiff's medical records.

## I. MOTION TO RESTRICT DOCUMENTS (DKT. NO. 18)

The defendants have asked the court to restrict the plaintiff's medical records under General Local Rule 79(d). "Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality." In re Specht, 622 F.3d 697, 701 (7th Cir. 2010). The Seventh Circuit has held that there is a general presumption that judicial records are public. Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co., 178 F.3d 943, 945 (7th Cir. 1999). That presumption "can be overridden only if . . . there is good cause for sealing a part or the whole of the record in that case." Id. (citations omitted). See also Civil L.R. 79(d)(3) (E.D. Wis.).

Although the plaintiff has put his health at issue in filing this lawsuit, courts in this district have found good cause for restricting public access to medical records themselves, but have concluded that there is not good cause to restrict access to other documents—such as briefs or proposed findings of fact—that incorporate information from those records. See, e.g., Chapman v. Raemisch, Case No. 15-cv-1254-LA, 2009 WL 425813, at *7 (E.D. Wis. 2009); Cole v. Janssen Pharmaceuticals, Inc., Case No. 15-cv-57-WCG, 2017 WL 2929523, at *3 (E.D. Wis. July 10, 2017). Eastern District courts have used a hybrid remedy to protect the plaintiff's privacy interests and the public's right to access, placing the "source documents themselves" under seal—the medical records—but ordering

2

that "[t]o the extent that information from the medical records is incorporated into other documents filed by the parties or orders issued by [the] court, that information" remained visible to the public. <u>Chapman</u>, 2009 WL 425813, at *7.

The defendants, not the plaintiff, have asked this court to restrict the medical records. The defendants have done this in an abundance of caution, given the protective order and the fact that the medical records include information not necessarily relevant to the plaintiff's claims. The court finds good cause to grant the defendants' motion as to the medical records themselves—Dkt. Nos. 23-7 and 29-4—but will deny the motion as to the redacted versions of the defendants' proposed findings of fact, their summary judgment brief, and the declarations of Hodel and Nikolay.

## II.   RELEVANT FACTS

A.   <u>The Parties' Versions of the Shakedown Search</u>

1.   *The defendants' version*

The defendants assert that between August 26, 2015 and February 22, 2016, the plaintiff was a pre-trial detainee at the Milwaukee County Jail. Dkt. No. 20-1 at ¶10. For part of that time—November 5, 2015 through February 22, 2016—he was on "maximum custody status."[1] <u>Id.</u> at ¶12. Per jail policy, inmates on "maximum custody status" are permitted only a legal pad, a sketch pad, a

_____

[1] The defendants go into detail about events that occurred while the plaintiff was on "maximum custody status." The court does not find those events relevant to the allegations in the plaintiff's complaint and does not discuss them here. The reader may find them at Dkt. No. 20-1, ¶¶11, 13-16.

3

book, a newspaper, unlimited legal papers, a soft-covered Bible or Koran, ten envelopes, ten stamps, ten pieces of non-legal mail, shampoo, soap, toothpaste, tooth brush and a comb. Id. at ¶33.

On January 18, 2016, the plaintiff was "the only inmate assigned to subpod A of pod 4A." Id. at ¶17. Around 9 a.m. that day, defendant Turner—a corrections officer lieutenant—and her staff executed a "shakedown search" of pod 4A. Id. at ¶¶23, 37. Shakedown searches involve a search of an entire pod—all individual cells and inmates—to "detect contraband, breaches in safety and security, and vandalism, among others." Id. at ¶31. Turner and her staff knocked on the plaintiff's cell door and ordered him to come out so that they could search the cell. Id. at ¶37. The plaintiff "initially" ignored these orders. Dkt. No. 33 at ¶38. The officers made "[s]everal other failed attempts" to get the plaintiff to come out of his cell. Id. at ¶39. Then the "corrections officer assigned to pod 4A"—the defendants do not identify this officer's name—saw the plaintiff place "an item or items in his underwear" and reported the fact to Turner. Id. at ¶40.

"Eventually," the plaintiff placed his hands through the door chute so the officers could place handcuffs on him. Dkt. No. 20-1 at ¶41. An officer searched the plaintiff's cell "without issue," and the officers started to search the plaintiff. Id. at ¶42. The defendant was put in a restraint system that straps at the waist. Dkt. No. 34 at ¶19. Jail staff, at their discretion, can execute a pat down search when they determine a need arises, including suspected possession of contraband items. Dkt. No. 20-1 at ¶27.

4

The defendants state that Officer Seel (not a defendant in this matter) performed the first pat down search while defendant Zetting "secured [the plaintiff's] left side." Id. at ¶43. Seel told Turner that he detected a hard object near the plaintiff's groin. Id. The plaintiff, however, "refused to acknowledge the presence of the contraband or inform officers or Lt. Turner of the nature of the contraband." Id. at ¶44. The plaintiff resisted the search, covering his groin with his hands when other unnamed officers made further attempts to discern what the hard object was. Id. at ¶45. He "refused to give up the contraband." Id. Turner called for more male officers "to assist in getting [the plaintiff] to voluntarily surrender his contraband." Id. at ¶46. Defendants Smith, Slocum and Carr responded to the call. Id. When the additional officers arrived, they saw the plaintiff outside the cell in the restraint system, tethered to his cell door and facing the wall, "secured by . . . Zetting, Seel and Carroll." Id. at ¶47. Turner instructed the officers to conduct additional searches to determine whether the plaintiff had an object in his underwear, and if so, discover what the object was and remove it from his underwear. Id. at ¶48. Smith conducted the search, and "while utilizing the bladed technique, felt something hard concealed near Plaintiff's groin area." Id. at ¶49. The "blade technique" is when the corrections officer "use his or her inner edge of his or her thumb and runs it along the inner thigh of the subject, ensuring no contraband is on the subject." Id. at ¶30. Because of the thickness of Smith's gloves, he asked for a second opinion regarding what he thought he'd felt. Id. at ¶49. Per Turner's instructions, Carr conducted a search, again using the bladed technique, and felt something hard

5

near the plaintiff's groin. Id. at ¶50. All the while, the plaintiff continued to resist and to refuse to give up the contraband. Id. at ¶51.

At this point, Smith "had to stabilize [the plaintiff's] head against the wall." Id. at ¶52. Slocum saw that the plaintiff's face was "slightly on the edge of his cell door's window," so Slocum "assisted in re-positioning [the plaintiff's] head for CO Smith so that it could be secured on an area away from the window's edge." Id. at ¶53. Once the plaintiff's head was re-positioned, Slocum saw the plaintiff's hands "cupped in front of his person, appearing to attempt to further secure and conceal contraband in his pants." Id. at ¶54. Slocum says he secured the plaintiff's hands with his own to keep the plaintiff from concealing the contraband "as CO Slocum did not know what it was and feared it could be a weapon." Id. at ¶55.

There came a point where the plaintiff "temporarily stopped actively resisting," and Zetting searched him using the bladed technique, again feeling something hard on the plaintiff's person. Id. at ¶56. But seconds later, Carr "had to stabilize [the plaintiff] against the wall and secure his leg." Id. at ¶57. The plaintiff didn't surrender the contraband until some nine minutes later, when Lt. Hein appeared. Id. at ¶59. During the time between the plaintiff leaving his cell and the time Hein arrived, none of the officers knew what the plaintiff had in his pants, or whether it was a weapon. Id. at ¶¶58-59. It turned out that the plaintiff had a radio, batteries and pencils "within a sock, which can easily be used as a weapon to assault both inmates and staff." Id. at ¶61.

Turner asserts that "[a]t various points" during this incident, she stepped away from the plaintiff to call her supervisor "to confirm the next steps when

6

dealing with a non-compliant inmate hiding contraband so as to ensure that jail policies, or worse, [the plaintiff's] constitutional rights, were not violated." <u>Id.</u> at ¶62.

### 2. *The plaintiff's version*

The plaintiff doesn't contest some of the defendants' facts. He doesn't disagree that he initially ignored requests to leave his cell, and that the officers tried several times to get him to leave without success. Dkt. No. 33 at ¶¶37-39. He says, however, that it was Officer Jones (not a defendant in this matter) who saw him put something in his pants; he says that Jones saw the plaintiff place a radio into his underwear and that Jones told Turner that that was what the plaintiff had. <u>Id.</u> at ¶40. He doesn't dispute the defendants' assertion that Carroll searched his cell, <u>id.</u> at ¶42, but asserts that it was Smith, not Seel, who performed the initial pat-down search, <u>id.</u> at ¶43. He asserts that the video footage of the search shows Smith reaching toward the plaintiff's groin area, and shows the plaintiff "react by tensing up," which the plaintiff says could lead a reasonable jury to conclude that "he was unexpectedly touched/grabbed." <u>Id.</u>

The plaintiff doesn't dispute that after the first attempted pat-down search, he refused to admit that he had contraband and he resisted further search. <u>Id.</u> at ¶¶44-45. He asserts, however, that Turner has admitted calling for additional officers for the purpose of trying to identify what the plaintiff was concealing, and to try to get the contraband to just fall out of the plaintiff's pants. <u>Id.</u> at ¶47. The plaintiff disputes the defendants' statement that Smith felt something during the second search, but asked for a second opinion, although he doesn't explain why.

7

Id. at ¶49. He also disputes that Carr conducted the "second opinion" search and felt something hard, although again he doesn't explain why. Id. at ¶50.

While the plaintiff doesn't dispute that he continued to resist the searches and continued to refuse to turn over the contraband, id. at ¶51, he disputes that Smith had to stabilize his head, id. at ¶52. He disputes that Slocum helped reposition his head, id. at ¶53, and he says that while he agrees he had his hands cupped in front of his groin, it wasn't to hide contraband—it was to protect his groin, id. at ¶54. The plaintiff asserts that the defendants have provided no evidence that they had reason to believe the contraband he had might have been a weapon. Id. at ¶55. He admits that Zetting felt something hard during *his* search, id. at ¶56, but disputes that Carr had to stabilize his leg, id. at ¶57. He disputes that the defendants had reason to be concerned about the nature of the contraband he was hiding, because, he says, the defendants were aware all along that he was hiding the radio he'd bought from the commissary. Id. at ¶¶58-59. Finally, the plaintiff disputes the defendants' contention that the items he had— the radio, batteries and pencils in the sock—could easily be used as a weapon. Id. at ¶61.

So what is it that the plaintiff says happened during these events? The court has tried to piece together the following sequence of events using the plaintiff's deposition testimony, his proposed findings of fact, his response to the defendants' proposed findings of fact and the statement he gave Detective Gaudynski during the jail's internal investigation of the incident:

8

The plaintiff states that the surveillance video of the search shows Smith searching the plaintiff's groin area. Id. at ¶23; Dkt No. 31 at 9:22:30. The plaintiff states—accurately, as far as the court can tell—that the video cannot corroborate all the details provided by the defendants because there are too many people obscuring the view. Id. The plaintiff contends that Smith grabbed his testicles during this search. Dkt. No. 33 at ¶¶43, 86, 95; Dkt. No. 34 at ¶¶20-23. According to the plaintiff, Slocum took hold of the plaintiff's hands, bending his fingers, and told Smith, "I got his hands now, search him again." Dkt. No. 34 at ¶20. Smith then grabbed at the plaintiff's testicles again, and according to plaintiff, said, "I feel it, I think it's coming out." Id. at ¶21; Dkt. No. 33 at ¶¶103-104. Meanwhile, the plaintiff was yelling, "You got my balls man. Let my balls go!" Dkt. No. 34 at ¶21; Dkt. No. 33 at ¶105. The plaintiff states that the officers who were restraining him then pushed his face up against the wall. Dkt. No. 33 at ¶105.

In terms of what happened next, as the court has noted, the plaintiff disputes the defendants' version of the events, but generally does not explain why he disputes them. For several of the facts, he merely states "dispute" or "disagree". Dkt. No. 33 at ¶¶49-57. The plaintiff does specifically refute a few of the facts. He contends that he was covering his groin to protect himself, not to prevent the officers from detecting the object in his underwear. Id. at ¶54. He also objects to the assertion that Slocum thought the plaintiff was concealing a weapon, stating that Slocum knew he was hiding a radio. Id. at ¶55. The plaintiff contends that all the officers knew he had a radio, and therefore they could not

9

claim they were afraid he had a weapon. Id. at ¶58. Additionally, the plaintiff

states that once the officers started to restrain him, "his legs were 'snatched' off

the ground and he was being 'dangled' in the air." Dkt. No. 20-1 at ¶111; Dkt. No.

33 at ¶111.

Neither the plaintiff nor the defendants dispute that throughout this search

process, the plaintiff was uncooperative and was refusing to relinquish the item

in his underwear. Dkt. No. 33 at ¶51. All parties also agree that Turner, at

various points during these searches, stepped away to call her supervisor. Id. at

¶62.

All parties agree that the plaintiff had in his underwear a radio, batteries

and pencils enclosed in a sock. Dkt. No. 33 at ¶61. The defendants contend these

objects easily could be used to assault both inmates and prison staff, dkt. no. 20-

1 at ¶61, whereas the plaintiff maintains that these are normal objects that

inmates are generally allowed to possess, dkt. no. 33 at ¶61. The plaintiff also

contends that the defendants knew he had concealed these items, and that they

knew were not dangerous. Id. at ¶¶58-59, 61.

B.     The Surveillance Video of the Shakedown Search

The surveillance video is mostly inconclusive, though it does verify a few

parts of each party's version of events. It does not have audio and the picture

quality is less than desirable. From what the court can tell, various prison officers

spend approximately fifteen minutes at the cell door, presumably having a

discussion with the plaintiff. Dkt. No. 31 at 9:01:26-9:15:19. At approximately

9:15, the officers open the plaintiff's cell door and begin restraining the plaintiff to

10

the door with the belt system. Id. at 9:15:20-9:15:31. The plaintiff appears calm and cooperative during this process, which takes ten to fifteen seconds. Id. Once the officers attach the plaintiff to the door, an officer begins a pat down search at 9:15:40. Id. Both the plaintiff and the officers appear to be calm during this search.

For the next six minutes or so, both the plaintiff and the officers continue to calmly stand while other officers conduct a search of the cell. Id. at 9:15:40-9:22:00. Then around 9:22, a different officer than the one who performed the first search begins patting down the plaintiff. Id. The search appears to focus on the groin area, but it is hard to see what is happening because other officers are partially obstructing the camera's view of the search. Id. The search appears to last for a little more than a minute. Id. at 9:22:28-9:22:40.

When the officer is done searching, he speaks to a third officer, who then performs a pat down search focusing on the groin area. Id. at 9:23:45. At this point, the plaintiff starts to move around and physically resists. Id. Approximately five officers restrain him against the door, each with one hand. Id. They do not appear to slam his head against the door. Id. They do appear to readjust his head. Id. For the next minute and a half, the officers appear to talk to the plaintiff. Id. at 9:23:46-9:25:28. Then it appears that the officer who performed the second search resumes searching the plaintiff's groin area. Id. at 9:25:28.

That officer stops searching, turns, and talks to a female officer with chin-length hair, who then goes off camera. Id. at 9:27:13. For a couple of minutes, the

11

officers continue to restrain the plaintiff, who still appears to be struggling against them, until the female officer with the chin-length hair returns. Id. at 9:33:24. Then, a fourth officer performs a pat down search focused on the plaintiff's groin area. Id. at 9:33:34. The plaintiff is more forcefully struggling against the search and the officers are restraining him during this search. Id. At this point, the plaintiff is twisting away from the officers restraining him, which results in him appearing to "dangle" briefly. Id. This search continues for approximately four minutes, with various officers appearing to try to access something around the plaintiff's groin area while the plaintiff continues to struggle. Id. at 9:35:47-9:39:08.

The search then ends and the female officer with chin-length hair appears to be talking to the plaintiff and the other officers. Id. at 9:40:12. Finally a grey-haired officer enters and spends several minutes talking to the plaintiff. Id. at 9:48-9:51. Once the conversation ends, the plaintiff is released from the restraints and put back in his cell. Id. It is unclear from the video if he relinquishes any items.

From the video, the court determines that there were at least four separate officers who conducted a search of the plaintiff's groin area, with others assisting during the last search. In light of the defendants' findings of fact, the court assumes that defendants Smith, Slocum, Carr and Zetting were the officers who searched the plaintiff and/or participated in restraining him while the search occurred. The court assumes that the officer with the chin-length hair is

12

defendant Turner. It appears that Turner was consistently checking in and monitoring the searches.

The video also corroborates the undisputed fact that the plaintiff was refusing to cooperate before the pat down searches began. It demonstrates that the plaintiff was physically resisting and struggling against the officers at various points. The video is inconclusive regarding the plaintiff's version of Smith's first search, specifically the conversation the plaintiff had with the various officers, because there is no audio. Furthermore, most of the pat down searches were also partially or totally blocked from view by other officers.

C.    The Events Following the Shakedown Search

After this incident, the plaintiff spoke to jail staff members and a social worker about wanting to report a sexual assault. Dkt. No. 20-1 at ¶25. Detective Gaudynski investigated the incident. Id. Gaudynski first interviewed the plaintiff on January 19, 2016. Id. at ¶92. They discussed at length what happened during the various searches. The plaintiff complained to Gaudynski of his testicles being squeezed, that Slocum reached into his pants, that Slocum bent his fingers back, that the officers pushed his face into the wall and that he was dangled in the air. Id. at ¶¶95-111. Gaudynski questioned the plaintiff regarding the search techniques used by Smith, and it is undisputed that the plaintiff demonstrated the "bladed" technique when describing the methods Smith used to search him. Dkt. No. 33 at ¶99. They also discussed whether the plaintiff, in placing his hands over his groin, could have prevented the touching the plaintiff complained of, and the plaintiff maintained that Smith squeezed his testicles and Slocum

13

touched his penis. Id. at ¶100, ¶102. At the end of the interview, neither the plaintiff nor the defendants dispute that the plaintiff said, regarding defendant Smith, "Honestly, I didn't, I didn't feel that he done it to me to receive sexual gratification." Id. at ¶114.

Gaudynski made note of the injuries the plaintiff complained of. He photographed the plaintiff's wrists and face. Dkt. 20-1 at ¶115. Gaudynski states that he did not observe that the plaintiff suffered any injuries, but the plaintiff disputes this. Dkt. No. 33 at ¶116. Gaudynski also states that the plaintiff never reported any injury to his genitals, or that he was humiliated or embarrassed by the incident. Dkt. No. 20-1 at ¶117. The plaintiff states that he did report his injuries. Dkt. No. 33 at ¶117.

Gaudynski interviewed the plaintiff again on January 27, 2016, this time with the benefit of the plaintiff's medical records. Dkt. No. 20-1 at ¶118. The undisputed medical records show that the plaintiff saw Nurse Grey the evening of the search and complained that his right wrist was broken. Id. at ¶126. The next day, he saw Kristen Murphy and Nurse Alaniz, again for wrist pain as well as for face swelling and pain. Id. at ¶¶127-128. Alaniz gave him acetaminophen, ibuprofen and ice packs. Id. at ¶128. She also ordered an x-ray of his right wrist. Id.

The day after that, the plaintiff saw Nurse Decker, complaining of wrist pain and testicular pain. Id. at ¶129. Decker noted wrist and testicular tenderness. Id. The plaintiff also had his wrist x-rayed that day. Id. at ¶130. His x-ray results came back five days later, and they were normal. Id.

14

On February 3, 2016, the plaintiff went back to Decker, complaining of numbness in his right thumb, pain in his right hand, pain in his left temple and testicular sensitivity. Id. at ¶131. He went back to Decker on February 15 for pain in his right wrist. Id. at ¶132. Decker continued to give him acetaminophen for his pain. Id.

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

15

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. The Court's Analysis

The Fourteenth Amendment's Due Process Clause applies to the plaintiff's claims, rather than the Eighth Amendment's Cruel and Unusual Punishment Clause, because the plaintiff was a pre-trial detainee and not a convicted inmate at the time of the events at issue. See Smith v. Dart, 803 F.3d 304, 309 (7th Cir., 2015) (quoting Bell v. Wolfish, 441 U.S. 520, 535 (1979)). Under the Fourteenth Amendment, "a pretrial detainee is entitled to be free from conditions that amount to 'punishment' . . . ." Id. To prove that he has been subjected to unconstitutional conditions of confinement, a pretrial detainee must show that the conditions were "objectively serious enough to amount to a constitutional deprivation, and [that] the defendant prison official must possess a sufficiently culpable state of mind." Id. (citations omitted). If a defendant's actions are "'rationally related to a legitimate nonpunitive governmental purpose'" or are not "excessive in relation to that purpose,'" then the pretrial detainee does not have a claim under the Fourteenth Amendment. Kingsley v. Hendrickson, 135 S. Ct. 2466, 2437 (2015) (quoting Bell 441 U.S. at 561).

16

### 1. Fourteenth Amendment Claims against Smith, Slocum, Carr and Zetting for Using Objectively Unreasonable Force

The plaintiff claims that defendants Smith, Slocum, Carr and Zetting used objectively unreasonable force in restraining him and conducting the pat down searches, violating his Fourteenth Amendment rights. To successfully overcome summary judgment, the plaintiff must show that the defendant (a) purposefully or knowingly used force against him, and (b) that the force was objectively unreasonable. Kingsley, 135 S. Ct. at 2472-73. Whether the force was objectively unreasonable "turns on 'the facts and circumstances of each particular case.'" Id. at 2473 (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). The court must consider those facts and circumstances from the perspective of a "reasonable officer" and consider "what the officer knew at the time, not with the 20/20 vision of hindsight." Id.

The court also must weigh the jail's need to maintain security, order and discipline. Id. (quoting Bell, 441 U.S. at 540, 547); see also Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 328 (2012). These are "essential goals that may require the limitation or retraction of retained constitutional rights of both convicted prisoners and pretrial detainees." Florence, 566 U.S. at 328. The court must objectively consider the prison officials' implementation of the jail's policies, procedures or practices designed to further these essential goals. Id. Unless there is "substantial evidence demonstrating that [the prison officials'] response was exaggerated", id., or a pretrial detainee can otherwise show that the prison officials' actions "are not 'rationally related to a

17

legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose,'" the pretrial detainee should not prevail on his constitutional claim. <u>Kingsley</u>, 135 S. Ct. at 2437 (quoting <u>Bell</u> 441 U.S. at 561).

The plaintiff claims that defendants Smith, Slocum, Carr and Zetting, in conducting a shakedown search for contraband, roughly restrained him and manhandled him to the point where it amounted to unconstitutional objectively unreasonable force. But even taking the facts in the light most favorable to the plaintiff, the defendants did not violate the plaintiff's Fourteenth Amendment rights by using objectively unreasonable force.

First, the defendants had reason to search the plaintiff. The plaintiff was on "maximum custody status." Dkt. No. 20-1 at ¶¶12-17. Per jail policy, inmates are routinely subject to shakedown searches for the purposes of finding contraband. <u>Id.</u> at ¶31. Jail policy restricts the items that inmates on "maximum custody status" may possess. <u>Id.</u> at ¶33. The parties do not dispute that the search in question was a routine shakedown search.

The plaintiff insists that the radio was not contraband because it is not a weapon or anything dangerous. Dkt. No. 33 at ¶61. He argues that the defendants knew he had a radio, and that the radio was not dangerous. In other words, the plaintiff argues that the force the defendants used was objectively excessive because it was disproportional to the danger of the item he was concealing—a radio.

18

Courts have defined contraband as "any unauthorized item" or "any item that is possessed in violation of prison rules." <u>Florence</u>, 566 U.S. at 332. The plaintiff, by his own admission, knew that he was not allowed to have a radio while on "maximum custody status." <u>See</u> Dkt. No. 33 at ¶33. The radio was contraband, and the plaintiff was not allowed to have it given his confinement status. Even if the court assumes that the defendants knew what the plaintiff had in his pants was a radio, he wasn't supposed to have it.

More relevant to the amount of force used, however, is that the plaintiff consistently and willfully attempted to conceal the radio (along with batteries and pencils) during a routine shakedown search, refusing to cooperate in the search and refusing to produce the contraband. Even if the defendants knew that the defendant had a radio in his pants, his level of resistance and his sustained resistance reasonably gave them cause for concern. The plaintiff could have had (and did have) something other than the radio in his pants. The fact that the plaintiff resisted so strenuously gave the defendants reason to believe that whatever the plaintiff was concealing was an object of concern. When the plaintiff refused to reveal and give up the item or items he was concealing, the defendants' use of pat down searches—several searches, given the defendant's continued resistance—to determine whether he, in fact, was concealing something in his underwear, and their attempts to retrieve whatever he was concealing from his groin area, were rationally related to the legitimate and nonpunitive purpose of ensuring that pretrial detainees on "maximum custody status" did not have contraband. Unless the defendants used an unreasonable amount of force,

19

"[d]eference must be accorded to [jail] administrators in the adoption and execution of policies and practies that are needed to preserve and ensure institutional security." McCottrell v. White, 933 F.3d 651, 663 (7th Cir. 2019) (citation omitted).

A reasonable jury could not conclude that the defendants used an excessive amount of force. The plaintiff states that he was slammed up against the door and that at one point he was dangling by the restraint system. While the surveillance video has its flaws, on this point, it provides insight and does not support the plaintiff's version of events. The defendants began restraining the plaintiff when he started physically resisting their search attempts. Dkt. No. 31 at 9:23:45. The video shows that five officers each placed one hand on the plaintiff, and at one point, readjusted his position. Id. When the plaintiff does appear to "dangle," it is because he is trying to twist away from the restraining officers and resist their attempts to retrieve the item. Id. Regarding the plaintiff's argument that Slocum bent back the plaintiff's fingers, dkt. no. 34 at ¶20, the video is inconclusive. Even if Slocum did bend back the plaintiff's fingers, he would have done so in the course of trying to secure the contraband. The court cannot conclude that bending back the plaintiff's fingers was objectively unreasonable, taking into account the facts and circumstances of the search. Kingsley, 135 S. Ct. at 2473. A reasonable officer in Slocum's position would have had reason to know that the plaintiff had something that he wasn't supposed to have, that he'd refused to cooperate with searches and refused to give up the contraband, that he'd done so in part by using his hands to cover up the contraband and that he'd

20

continued to resist despite the efforts of several officers. In that instance, bending back the plaintiff's fingers was not an excessive amount of force in the face of an escalating security issue and the plaintiff's active resistance. Id.

Aside from his interpretation of the video, the primary evidence to which the plaintiff points as proof that the defendants' actions were objectively unreasonable is evidence of his injuries. A court may consider the extent of a plaintiff's injuries in determining whether the force used was objectively excessive. Id. "The extent of injury is relevant to the Eighth Amendment inquiry because it provides some indication of the amount of force applied, and because it may suggest whether the use of force was plausibly necessary in a particular situation . . ."[2] McCottrell, 933 F.3d at 664 (citing Wilkins v. Gaddy, 449 U.S. 34, 37 (2010)). "[T]he minor nature of . . . injuries strongly suggest that the force applied . . . was de minimus." Outlaw v. Newkirk, 259 F.3d 833, 839 (7th Cir. 2001) (collecting cases). While a plaintiff need not "demonstrate a significant injury to state a claim for excessive force," "the minor nature of the injury coupled with the absence of any other indicia of malice . . . would force [the court] to conclude that [the force] does not rise to the level of a constitutional violation." Id. at 839-40.

The plaintiff's medical records show that his injuries were minor: a swollen face, tender testicles and sore wrist—all treated with over-the-counter pain

---

[2] The court is aware that the plaintiff's excessive force claim arises under the Fourteenth Amendment, not the Eighth.

medicine. Dkt. No. 20-1 at ¶¶118-132. If the record contained evidence that the defendants acted with malicious intent to harm the plaintiff, the minor nature of his injuries would be irrelevant. If the video supported the plaintiff's claims that the defendants "smashed" his head or that they deliberately dangled him in the air, the minor nature of his injuries would be irrelevant. But the record does not provide indicia of malice or support the plaintiff's claims that the defendants used more force than was necessary to recover the contraband. That, coupled with the minor nature of the plaintiff's injuries, compels the court to conclude that even considering the facts in the light most favorable to the plaintiff, a reasonable jury could not conclude that the defendants violated the plaintiff's Fourteenth Amendment rights by using excessive force to search him and retrieve the contraband. The court will grant summary judgment in the defendants' favor on this claim.

### 2. Fourteenth Amendment Claims against Smith and Slocum for Unwanted Sexual Touching

The plaintiff also claims that defendants Smith and Slocum violated his Fourteenth Amendment rights when, while attempting to retrieve the contraband radio from his underwear, Smith grabbed his testicles and Slocum touched his penis.

In Washington v. Hively, 695 F.3d 641, 643, (7th Cir. 2012), the Seventh Circuit found that in order to violated the pre-trial detainee's constitutional rights during a pat down search where the prison official touched a detainee's genitals, the prison official either must have sought to humiliate the detainee or sought to

22

gratify the official's own sexual desires. But, where the official "was merely overzealous in conducting the pat down and strip search, there [is] no deliberate violation of a constitutional right and so no basis for the suit." Id.

The Washington court found that there was a material question of fact as to whether the prison official in that case fondled the pre-trial detainee's testicles for several seconds, and it remanded the case back to the district court. Id. The court suggested that if the evidence showed the official did fondle the pre-trial detainee, it was likely that a reasonable fact finder would determine that such actions were a constitutional violation. Id. Similarly, in Rivera v. Drake, 497 Fed. Appx. 635, 637-638 (7th Cir. 2012), the court determined that while there was a material question of fact as to whether the prison official inserted a thumb up the inmate's buttocks during a search, if it had happened, the conduct would implicate the inmate's constitutional rights.

Here, the parties dispute whether Smith grabbed the plaintiff's testicles and Slocum touched the plaintiff's penis. But even taking the facts in the light most favorable to the plaintiff, the incidents do not rise to the level of a constitutional violation. The plaintiff alleges that while in the process of searching for the item in the plaintiff's underwear, Smith grabbed his testicles instead. Dkt. No. 34 at ¶21, Dkt. No. 33 at ¶105. The plaintiff does not offer any evidence that Smith took this action to humiliate him or that it was for Smith's own sexual gratification. In fact, the plaintiff admitted during the jail's investigation of the incident that he "didn't feel that [Smith] done it me to receive sexual gratification." Dkt. No. 33 at ¶114.

23

The undisputed evidence here shows that Smith's touch was incidental to the search. In describing the touch to Detective Gaudynski, the plaintiff stated that he exclaimed, "You got my balls man. Let my balls go!" Id. It appears that the plaintiff was notifying Smith that Smith didn't have the contraband, he had the plaintiff's person. The video shows that the plaintiff was uncooperative—twisting, and resisting the officers' attempts to detect and retrieve the item concealed in his underwear; it is quite likely that Smith accidentally grabbed the plaintiff's testicles in the scuffle, and the plaintiff's exclamation was the plaintiff's way of notifying Smith of the error. The nature of the plaintiff's injuries supports this conclusion; medical staff reported that he had "tenderness," and treated him with over-the-counter pain medication.

The evidence shows that Smith's touch was incidental to the search, a legitimate penological interest, and that the plaintiff's injuries were minor. Coupled with the fact that the plaintiff presents no evidence of Smith's intent to humiliate him or sexually gratify himself, the court concludes that no reasonable jury could find that Smith violated the plaintiff's Fourteenth Amendment rights.

Similarly, Slocum's touch was incidental to his search of the plaintiff. The facts taken in the light most favorable to the plaintiff show that during the third pat down search, while the plaintiff was actively resisting, Slocum noticed that the plaintiff cupped hands over his groin. Dkt. No. 20-1 at ¶¶53-54. The video shows that at this point, several officers were attempting to retrieve the item the plaintiff was concealing. Dkt. No. 31 at 9:33. The plaintiff states it was during this

24

time that Slocum reached into his underwear and touched his penis. Dkt. No. 33 at ¶84, ¶¶101-102; Dkt. No. 34 at ¶¶24-25.

Assuming this touch occurred, it occurred at the height of the plaintiff's resistance to the officers' attempts to retrieve whatever the plaintiff was concealing. The plaintiff offers no evidence that Slocum touched him to humiliate him or for Slocum's sexual gratification. He does not offer evidence that any significant injury resulted from the touch. Even if it occurred, the record shows that Slocum's touch was incidental to the search, a legitimate penological interest, and he did not violate the plaintiff's constitutional rights. No reasonable jury could find otherwise.

### 3. Failure to Intervene Claim against Turner

Finally, the plaintiff claims that by allowing the other defendants to conduct pat down searches and violate his constitutional rights, Turner violated his rights because she impermissibly failed to intervene. A prison official can be found liable under §1983 "if she acts or fails to act with a deliberate or reckless disregard of the plaintiff's constitutional rights." Fillmore v. Page, 358 F.2d 496, 506 (7th Cir. 2004). But the court has determined that as a matter of law, none of the defendants violated the plaintiff's constitutional rights. No reasonable jury could hold Turner liable for failing to intervene because there was no underlying constitutional violation in which she should have intervened. Id.

Even if the court had found a material question of fact as to whether the other defendants violated the plaintiff's constitutional rights, the record does not support a claim that Turner failed to intervene. The parties agree, and the video

25

shows, that Turner monitored the situation. The record shows that Turner consistently checked in with her supervisors and stopped the proceedings when questions arose. Dkt. No. 33 at ¶62. There is no evidence of deliberate or reckless disregard on Turner's part. There is no evidence that Turner was aware that other officers were using excessive force, or touching the plaintiff inappropriately, but refused to act. The plaintiff argues only that Turner was present. "In the absence of evidence of . . . an underlying rights violation," the court must grant summary judgment in Turner's favor. Fillmore, 358 F.3d at 506.

### 4. Qualified Immunity

The defendants also argued that they were entitled to qualified immunity. Because the court grants summary judgment on the merits, the court does not need to address the qualified immunity argument.

## III. CONCLUSION

The court **GRANTS** the defendants' motion to restrict the plaintiff's medical records regarding Dkt. Nos. 23-7 and 29-4. Dkt. No. 18. The court **ORDERS** that those documents will remain restricted to the court and the parties until further order of the court.

The court **DENIES** the defendants' motion to restrict their proposed findings of fact, their brief in support of summary judgment and the declarations of Dale Nikolay and Jason Hodel. Dkt. No. 18. The court **ORDERS** that the Clerk of Court shall unrestrict the documents at Dkt. No. 20-1 (defendants' proposed findings of fact, unredacted); Dkt. No. 21-1 (defendants' brief in support of their

26

motion for summary judgment, unredacted); Dkt. No. 23-1 (declaration of Jason Hodel, unredacted); and Dkt. No. 29-1 (declaration of Dale Nikolay, unredacted).

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 19**.**

The court **DISMISSES** this case and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. <u>See</u> Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment.  The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 30th day of September, 2019.

BY THE COURT:

_____

**HON. PAMELA PEPPER**
**United States District Judge**

28